# Illinois Official Reports

## Appellate Court

---

### *Carolan v. City of Chicago*, 2018 IL App (1st) 170205

---

| | |
|---|---|
| Appellate Court Caption | MARGARET CAROLAN, as Independent Executor of the ESTATE OF MICHAEL J. NORTON, Deceased, and BRITTANY NORTON, Plaintiffs-Appellants, v. THE CITY OF CHICAGO, a Municipal Corporation, and THE OFFICE OF EMERGENCY MANAGEMENT & COMMUNICATIONS, a Department of the City of Chicago, Defendants (City of Chicago, Defendant-Appellee). |
| District & No. | First District, First Division<br>Docket No. 1-17-0205 |
| Filed | June 18, 2018 |
| Decision Under Review | Appeal from the Circuit Court of Cook County, No. 16-L-4331; the Hon. Daniel T. Gillespie, Judge, presiding. |
| Judgment | Affirmed. |
| Counsel on Appeal | Baumann & Shuldiner, of Chicago (Deidre Baumann, of counsel), for appellants.<br><br>Edward N. Siskel, Corporation Counsel, of Chicago (Benna Ruth Solomon, Myriam Zreczny Kasper, and Sara K. Hornstra, Assistant Corporation Counsel, of counsel), for appellee. |

PRESIDING JUSTICE PIERCE delivered the judgment of the court, with opinion.
Justices Harris and Mikva concurred in the judgment and opinion.


**OPINION**

¶ 1    Plaintiffs Margaret Carolan, as independent executor of the estate of Michael J. Norton, deceased, and Brittany Norton, the decedent's daughter (collectively, plaintiffs), sued the City of Chicago (City) and the Office of Emergency Management and Communications (OEMC)[1] to recover damages for the death of Michael J. Norton. Plaintiffs alleged that, in May 2009, defendants failed to timely dispatch police in response to a 911 call reporting an armed robbery in progress at Norton's convenience store and that Norton was shot and killed less than two minutes before police arrived. The circuit court granted summary judgment in favor of the City on the basis that the City was immune under the Local Governmental and Governmental Employees Tort Immunity Act (Tort Immunity Act) (745 ILCS 10/4-102 (West 2008)), that the City did not owe Norton any duty, and that plaintiffs could not establish either proximate cause or that the City engaged in willful and wanton misconduct. For the following reasons, we affirm.

¶ 2                                    BACKGROUND

¶ 3    In the evening of May 14, 2009, Norton was working in the convenience store he owned at 4759 West North Avenue, Chicago, Illinois, located on the first floor of an apartment building that he owned and operated. Several people entered the store, including one wearing a ski mask and armed with a gun. A passerby saw someone wearing a ski mask inside Norton's store and called 911. OEMC received the 911 call at 7:12 p.m. The passerby placed a second 911 call that OEMC received at 7:17 p.m. At 7:20 p.m., a police unit was dispatched to the scene. Three additional units were dispatched within the next two minutes, and additional units were dispatched thereafter. When police arrived at Norton's store, they found Norton tied up inside a storage area with a gunshot wound to the head. Medical personnel pronounced Norton dead at the scene.[2]

¶ 4    Plaintiffs initiated this action in 2010 and filed an amended complaint in June 2012. The parties engaged in discovery and the case was set for trial. Plaintiffs voluntarily dismissed their complaint on the eve of trial and timely refiled their complaint in April 2016. The refiled complaint alleged that Norton was shot and killed two minutes before police arrived on the scene and that the failure to dispatch police to an armed robbery in progress until eight minutes after the initial 911 call was "willful and wonton" and "demonstrated a reckless disregard" for

---

[1]In the circuit court, the City argued that OEMC was not a suable entity because "it is merely a division of the City of Chicago, with no independent legal existence." Plaintiffs did not advance any argument in response to the City's position. The circuit court agreed with the City and dismissed OEMC as a defendant. Plaintiffs raise no argument on appeal as to whether OEMC is a suable entity, and we therefore treat the City as the only proper defendant.

[2]Beatrice Rosado, who was a tenant in Norton's building, and her boyfriend Elvin Payton were identified as the offenders and both later pleaded guilty to killing Norton.

Norton's welfare. The refiled complaint asserted wrongful death and survival claims on behalf of Norton's estate and a loss of society claim on behalf of Brittany.

¶ 5    The City moved for summary judgment. The City argued, in relevant part, that under section 4-102 of the Tort Immunity Act, it was immune from any liability for failing to prevent Norton's death, failing to provide adequate police protection or services, or failing to make arrests. *Id.* The City further argued that it did not owe Norton any common law duty to protect him from a third party attack. Furthermore, the City argued that there was no genuine issue of material fact as to proximate cause because Norton's death was due to a criminal act by a third party and plaintiff could only speculate as to whether an earlier dispatch of police to the scene would have prevented Norton's death. The City's motion was fully briefed, and we summarize the evidence submitted by the parties in connection with the City's motion for summary judgment.

¶ 6    Erin Hansen testified at her deposition that she was the supervisor of investigations for OEMC. She explained that when a 911 call is received, a communications operator obtains the relevant information from the caller and inputs data into a computer aided dispatch (CAD) system. The communications operator then electronically transmits the CAD data to the appropriate police dispatcher, who then assigns field units to the call. For ongoing situations such as a robbery in progress, an operations supervisor follows up on the dispatch functions and monitors the situation. Each 911 call is assigned an event number, event type, and priority level by either the communications operator or the dispatcher. There are five priority levels. Priority 1, the highest civilian priority level, indicates a threat to life and includes acts that are in progress that could result in significant loss or damage to property where an arrest could be effectuated. Level 1 contains subcategories A through D, with subcategory A indicating the highest ranking.

¶ 7    Hansen explained that, here, the initial 911 call was received by OEMC at 7:11:57 and was logged by OEMC at 7:12:30 p.m. The call was coded as a "ROBIP," indicating a robbery in progress; was assigned priority level 1A; and was transferred to the appropriate dispatcher. The second 911 call was received at 7:17:19 p.m. and logged at 7:21:23 p.m. OEMC standards provide that a priority 1A call be dispatched within 10 minutes of the call being received. Between 7:20:41 p.m. and 7:21:03 p.m., the dispatcher dispatched four units to 4759 West North Avenue. Hansen could not say for certain why units were not dispatched sooner, but Hansen explained that on May 14, 2009, between 2:50 p.m. and 10:23 p.m., District 25 (which includes 4759 West North Avenue) was under a "radio assignments pending" (RAP), meaning there were more events pending than field units available. Hansen could not be certain that there were actually more events pending than units available but stated that the most likely reason for the eight minute dispatch time was that no units were available for immediate dispatch. OEMC records did not reflect what activities the units that ultimately responded were engaged in prior to being dispatched to 4759 West North Avenue.

¶ 8    On December 29, 2016, the circuit court entered a written order, granting summary judgment in favor of the City. The circuit court concluded that a 911 operator's alleged failure to timely transmit a 911 request was a failure to provide adequate police protection and therefore fell within the immunity provision of section 4-102 of the Tort Immunity Act. See *id.* The circuit court further concluded that the City's conduct was not willful and wanton because the conduct alleged "could be, at most, characterized as inadvertence or incompetence." The circuit court noted that all available police units were on assignment at the time of the initial

911 call and that police were dispatched within 8 minutes of the initial call, which was within the 10 minute OEMC internal standard. Furthermore, the circuit court concluded that the City did not owe Norton any common law duty to protect him against attacks by a third party because Norton and the City did not stand in any recognized special relationship. Finally, the circuit court found that plaintiffs could not establish proximate cause because the legal cause of Norton's death was the independent criminal act of a third party and legal cause is not established where the alleged negligence only creates a condition that allowed the injury to be possible. Plaintiffs filed a timely notice of appeal.

¶ 9                                                    ANALYSIS

¶ 10        On appeal, plaintiffs argue that the City is not entitled to immunity under section 4-102 of the Tort Immunity Act. Plaintiffs contend that the circuit court misconstrued their claims because "[t]his case is not about what the police did or did not do, it is about the failure of 911 to dispatch police pursuant to an emergency call." Plaintiffs argue our legislature intended the Emergency Telephone System Act (50 ILCS 750/15.1 (West 2008)) to govern immunity for the actions of emergency dispatchers because it is the more recently enacted and specific legislative pronouncement. Plaintiffs further argue that the circuit court erred in finding that plaintiffs could not establish willful or wanton misconduct or proximate cause and that the City did not owe Norton a duty.

¶ 11        Summary judgment is appropriate if the pleadings, depositions, affidavits, and other admissions on file establish that there is no genuine issue of material fact and that the moving party is entitled to judgment as a matter of law. 735 ILCS 5/2-1005(c) (West 2016); *Cohen v. Chicago Park District*, 2017 IL 121800, ¶ 17. The purpose of summary judgment is not to try a question of fact, but rather to determine whether one exists. *Robidoux v. Oliphant*, 201 Ill. 2d 324, 335 (2002). "In determining whether a genuine issue of material fact exists, the court must construe the pleadings, depositions, admissions, and affidavits strictly against the movant and liberally in favor of the nonmovant." *West Bend Mutual Insurance Co. v. DJW-Ridgeway Building Consultants, Inc.*, 2015 IL App (2d) 140441, ¶ 20. A party moving for summary judgment bears the initial burden of production and may satisfy it by either showing that some element of the case must be resolved in its favor or that there is an absence of evidence to support the nonmoving party's case. *Nedzvekas v. Fung*, 374 Ill. App. 3d 618, 624 (2007). Once the moving party satisfies that initial burden, the burden shifts to the nonmoving party to come forward with some factual basis that would entitle it to a favorable judgment. *Id.* We review a circuit court's ruling on summary judgment *de novo*. *Standard Mutual Insurance Co. v. Lay*, 2013 IL 114617, ¶ 15.

¶ 12        Plaintiffs contend that section 4-102 of the Tort Immunity Act does not apply here because their claims do not allege any failure to provide adequate police protection. Plaintiffs further argue that even if section 4-102 of the Tort Immunity Act could apply, section 15.1 of the Emergency Telephone System Act provides the "controlling immunity" because it is the more specific immunity. We find that section 4-102 of the Tort Immunity Act does apply based on our supreme court's decision in *DeSmet v. County of Rock Island*, 219 Ill. 2d 497 (2006).

¶ 13        Section 4-102 of the Tort Immunity Act provides:

        "Neither a local public entity nor a public employee is liable for failure to establish a police department or otherwise provide police protection service or, if police protection service is provided, for failure to provide adequate police protection or service, failure

to prevent the commission of crimes, failure to detect or solve crimes, and failure to identify or apprehend criminals. This immunity is not waived by a contract for private security service, but cannot be transferred to any non-public entity or employee." 745 ILCS 10/4-102 (West 2008).

¶ 14    In *DeSmet*, the plaintiff sued numerous governmental entities and government employees to recover damages for the death of Doris Hays. Hays was driving her automobile near the county line between Rock Island County and Henry County when her car left the road and ran into a ditch. *DeSmet*, 219 Ill. 2d at 500. A passing motorist observed Hays's car leave the road and called the clerk of the Village of Orion, Illinois, to report what she saw including the location of the accident. *Id.* at 500-01. The village clerk contacted a dispatcher for Henry County, who in turn contacted the dispatcher for the City of Moline and the City of East Moline, who in turn contacted the sheriff's department for Rock Island County. *Id.* at 501. No emergency services, however, were dispatched to the scene of the accident. *Id.* at 502. Three days later, Hays's body was found lying outside her vehicle at the scene of the accident. *Id.* Plaintiff filed a complaint, asserting wrongful death and survival claims against Rock Island County, Henry County, the Village of Orion, the City of Moline, the City of East Moline, and several individuals in their official capacities. *Id.* at 502-03. The circuit court dismissed the plaintiff's complaint with prejudice, finding that the defendants were immune from tort liability under section 4-102 of the Tort Immunity Act. *Id.* at 503. We affirmed the judgment of the circuit court. *Id.* at 503-04.

¶ 15    Our supreme court affirmed. The court agreed with several appellate panels that section 4-102 is implicated where "the assistance required *** falls within the statutory umbrella of 'police protection services.' " *Id.* at 512 (citing *McElmeel v. Village of Hoffman Estates*, 359 Ill. App. 3d 824, 827-29 (2005), and *Kavanaugh v. Midwest Club, Inc.*, 164 Ill. App. 3d 213, 221 (1987)). The court rejected the plaintiff's argument that the defendants' failure to respond to an emergency call was the equivalent of failing to provide any police services, finding that the "governmental defendants rendered police protection service to the general public via their dispatch centers." *Id.* at 513. The court further rejected the plaintiff's argument that *Doe v. Calumet City*, 161 Ill. 2d 374 (1994), recognized a willful and wanton exception to section 4-102. The *DeSmet* court first observed that *Doe*'s holding was overruled *sub silentio* by *Zimmerman v. Village of Skokie*, 183 Ill. 2d 30 (1998),[3] and further held that *Doe* addressed a situation where a police officer's "outrageous conduct" was governed by section 2-202 of the Tort Immunity Act (745 ILCS 10/2-202 (West 2002)), due to that officer's control over a crime scene. *DeSmet*, 219 Ill. 2d at 515, 518-19 (citing *Doe*, 161 Ill. 2d at 390-91). The *DeSmet* court observed that *Doe* involved a situation where police had responded to an emergency call, whereas the defendants in *DeSmet* did not respond at all. *Id.* at 520. The court stated:

> "Where no officers respond to the scene—whether it is because no police protection services are provided or because the services provided prove to be inadequate—the status quo *ante* is at least not altered to the detriment of those present. We believe that to be the reasoning behind the legislature's enactment of section 4-102 of the Tort Immunity Act." *Id.* at 521.

¶ 16    The court concluded:

---

[3]*Zimmerman* was expressly abrogated in *Coleman v. East Joliet Fire Protection District*, 2016 IL 117952, which abolished the public duty rule and special duty exception.

"Although we firmly believe that citizens have a right to expect the police to respond in a situation like this, the issue here is whether section 4-102 of the Tort Immunity Act immunizes the defendants from liability and the consequent payment of public funds in satisfaction of an individual's damage claims. [Citation.] Section 4-102 immunity applies in this case." *Id.* at 522.

¶ 17　　Here, similar to the situation in *DeSmet*, a passerby called 911 to report an emergency situation and the City failed to dispatch police in response to the first emergency call. Under these circumstances, the assistance required of the City's 911 service—a police response to a crime in progress—clearly falls within section 4-102's "police protection services." Under the holding of *DeSmet*, we conclude that section 4-102 of the Tort Immunity Act provides immunity to the City for any failure to provide police protection services or for any inadequate provision of those services.

¶ 18　　Plaintiffs contend, however, that even if section 4-102 could apply, section 15.1 of the Emergency Telephone System Act should control because it is the more specific immunity. Plaintiffs rely on plain language of section 15.1 of the Emergency Telephone System Act, a federal district court decision in *Harrell v. City of Chicago Heights*, 945 F. Supp. 1112 (N.D. Ill. 1996), and our supreme court's decision in *Coleman*, 2016 IL 117952, to argue that section 15.1 applies.

¶ 19　　At the outset, we observe that plaintiffs' brief incorrectly asserts that

"The plain language of 50 ILCS 750/15.1, as it existed at all relevant times, provided that a 'unit of local government assuming the duties of an emergency telephone system board,' such as the [OEMC], would not be liable for civil damages 'that directly or indirectly results from, or is caused by, any act or omission in the *** operation, maintenance, performance, or provision of 9-1-1 service required by this Act, unless the act or omission constitutes gross negligence, recklessness, or intentional misconduct.' 50 ILCS 750/15.1 (2017) [*sic*]."

¶ 20　　As the City correctly observes in its brief, however, the version of section 15.1 of the Emergency Telephone System Act cited by plaintiffs did not become effective until January 1, 2016, when our legislature enacted Public Act 99-6, which was well after the events in question. See Pub. Act 99-6, § 2-10 (eff. Jan. 1, 2016) (amending 50 ILCS 750/15.1). Plaintiffs made no argument in the circuit court—and develop no argument on appeal—that the 2016 legislative amendments apply to this case, nor did plaintiffs file a reply brief in this court to address their reliance on the amended version of the statute. Plaintiffs have forfeited any contention that the 2016 amendments apply retroactively, and therefore we will rely on the version of section 15.1 that was in effect in May 2009, which provided, in relevant part:

"No public agency *** or unit of local government assuming the duties of an emergency telephone system board, nor any officer, agent or employee of any public agency *** or unit of local government assuming the duties of an emergency telephone system board, shall be liable for any civil damages as a result of any act or omission, except willful or wanton misconduct, in connection with developing, adopting, operating or implementing any plan or system required by this Act." 50 ILCS 750/15.1 (West 2008).

Whereas section 4-102 of the Tort Immunity Act contains no exception for willful and wanton conduct (*DeSmet*, 219 Ill. 2d at 515), section 15.1 of the Emergency Telephone System Act

expressly permitted for civil liability based on willful or wanton misconduct (50 ILCS 750/15.1 (West 2008)).

¶ 21 Plaintiffs make little effort to explain how a tort claim for damages based on an alleged willful or wanton failure to promptly dispatch police in response to an emergency call amounts to an "act or omission *** in connection with developing, adopting, operating or implementing any plan or system required by [the Emergency Telephone System] Act." *Id.* The plain language of the applicable version of section 15.1 related to an emergency system operator's development, adoption, operation, or implementation of an emergency "plan or system" and did not expressly contemplate the provision of emergency services. Therefore, based on the plain language of section 15.1, the provision of 911 services was not governed by the Emergency Telephone System Act in May 2009.

¶ 22 The parties direct our attention to four appellate court decisions and one federal district court order that have addressed the applicability of the Emergency Telephone System Act. Those cases, however, were all decided prior to our supreme court's decision in *DeSmet*, and only two of those cases addressed a situation that clearly fell within section 15.1.

¶ 23 In *Galuszynski v. City of Chicago*, 131 Ill. App. 3d 505 (1985), the plaintiffs sued the City to recover damages for injuries they sustained during a burglary. The plaintiffs alleged that they called 911 to report someone attempting to break into their home but that police did not arrive until 24 minutes after the 911 call, during which time the intruder entered the plaintiffs' home and attacked them. *Id.* at 506. The City moved to dismiss the plaintiffs' complaint, asserting that the City was immune under section 4-102 of the Tort Immunity Act and that the plaintiffs failed to allege any special duty. *Id.* The circuit court dismissed the plaintiffs' complaint, and we affirmed the circuit court's judgment, finding that the plaintiffs did not adequately allege any special duty. *Id.* at 508. The plaintiffs also argued on appeal that section 15.1 of the Emergency Telephone System Act provided for tort liability based on willful or wanton misconduct on the part of police officials operating a 911 system. *Id.* at 509. We observed, however, that the plaintiffs' argument would require us to find that section 4-102 of the Tort Immunity Act was "implicitly repealed by the enactment of section 15.1 of the [Emergency Telephone System Act]," and we declined to make any such finding. *Id.*

¶ 24 One year later, a different panel of this court filed an opinion in *Barth v. Board of Education of the City of Chicago*, 141 Ill. App. 3d 266 (1986). There, the plaintiff sued both the Board of Education of the City of Chicago and the City of Chicago to recover for injuries sustained by his 11-year-old son, who suffered a head injury while at school. *Id.* at 269. Twenty five minutes after the injury, the school called 911. *Id.* at 269-70. The school called 911 two more times in the next 45 minutes. *Id.* at 270. An ambulance was dispatched three minutes after the third call, and the boy was taken to the hospital. *Id.* at 271. The plaintiff's complaint asserted negligence claims against the defendants and alleged that the defendants' conduct was willful and wanton. *Id.* At trial, a doctor testified that the delay in transporting the boy to the hospital permitted a blood clot on the boy's brain to grow from the size of a walnut to the size of an orange. *Id.* After the close of the plaintiff's case in chief, the circuit court denied the defendants' motions for a directed verdict, which asserted in part that the defendants were immune from liability. *Id.* at 271-72. A jury returned a verdict in favor of plaintiff, and defendants appealed. *Id.* at 272. On appeal, we rejected the defendants' arguments that the 911 system was a police protection service and therefore concluded that defendants were not immune from liability under section 4-102 of the Tort Immunity Act. *Id.* at 278-79. We

expressly disagreed with *Galuszynski*'s assumption that the 911 system was a police protection service for the purpose of section 4-102 of the Tort Immunity Act. *Id.* We concluded that "the applicable standard of liability is that of wilful and wanton misconduct, found in section 15.1 of the [the Emergency Telephone System] Act." *Id.* at 280.

¶ 25 In *Harrell*, 945 F. Supp. at 1114, the plaintiffs sued the City of Chicago Heights, Illinois Bell Telephone Company, and Ameritech Corporation for wrongful death, loss of consortium, and federal civil rights violations for allegedly failing to provide emergency services. The plaintiffs alleged that Patrick Harrell suffered a heart attack and that family members and neighbors called 911, but that the dispatcher hesitated in responding to the first of the emergency calls while attempting to ascertain whether the plaintiffs lived within the city's service boundaries. *Id.* Harrell was eventually transported to a hospital by an ambulance from a neighboring municipality, but died at the hospital. *Id.* The plaintiffs contended that the city and the telephone providers were liable based on the failure to designate the plaintiffs' phone number and address to receive for 911 services despite the fact that the plaintiffs lived within the city's municipal boundaries for more than 20 years. *Id.* The city moved for summary judgment asserting, in part, that it was immune from liability under section 5-101 of the Tort Immunity Act (745 ILCS 10/5-101 (West 1992)). *Harrell*, 945 F. Supp. at 1115. The district court disagreed, finding that there was no " 'complete[ ] fail[ure]' to provide emergency services and any subsequent actions fell outside the scope of the immunity provisions of [section] 5-101." *Id.* at 1116. The district court then determined that the city's liability in relation to 911 services "is more properly governed by [the Emergency Telephone System Act]." *Id.* The district court looked to section 15.1 and concluded "the [c]ity could be liable for damages caused by willful and wanton misconduct taken by itself or its agents in regard to the failure to include the Harrell residence in the [911] system or for the failure expeditiously to dispatch rescue vehicles to the Harrell residence." *Id.* at 1117. The district court relied on our decision in *Barth* to conclude that applying section 5-101 of the Tort Immunity Act's immunity for failure to "otherwise *** provide [***] rescue or other emergency service" would "defeat the purpose of the [Emergency Telephone Service] Act." (Internal quotation marks omitted.) *Id.* The federal district court, like the court in *Barth*, distinguished *Galuszynski* on the basis that "the [c]ity's provision of [911] paramedic service is clearly not a 'police protection service.' " *Id.* In sum, the district court concluded that the city could be liable for damages on a showing of willful and wanton misconduct. *Id.* at 1118.

¶ 26 Finally, in *Chiczewski v. Emergency Telephone System Board of Du Page County*, 295 Ill. App. 3d 605 (1997), the plaintiffs sued defendant to recover damages for injuries sustained by a minor child during a home invasion. The plaintiffs resided in an unincorporated area outside of the City of Naperville. *Id.* at 607. The Illinois Commerce Commission had previously ordered the defendant to cover that unincorporated area with its emergency telephone system, but the defendant had failed to so. *Id.* at 606-07. When the child's mother called 911, her call was routed to Naperville's emergency telephone system rather than the defendant's system. *Id.* at 607. The Naperville dispatcher could not dispatch emergency services outside of Naperville but immediately transferred the mother's call to the Du Page County sheriff's office. *Id.* Police arrived at the plaintiffs' home within 11 minutes of the emergency call and paramedics arrived a few minutes later, but the mother had already left to drive the child to a hospital. *Id.* Plaintiffs sued, asserting that defendant's failure to implement a 911 system was willful and wanton. *Id.* The circuit court granted summary judgment in favor of the defendant, finding that the

defendant's conduct was not willful and wanton. *Id.* On appeal, the plaintiffs argued in part that the defendant failed to enter into an agreement with Naperville and was aware that the plaintiffs' home was not sufficiently covered by Naperville's emergency telephone system. *Id.* at 609. We rejected that argument and observed that the plaintiffs "failed to plead any facts or present any evidence that [the] defendant should have been aware that calls from [the] plaintiffs' subdivision would be misrouted to Naperville." *Id.* We further found that the plaintiffs could not establish willful and wanton misconduct because the plaintiffs only showed "that a misrouting of an emergency call may have contributed to an 11-minute response time by emergency personnel," which did not evince "intent, utter indifference, or conscious disregard." (Internal quotation marks omitted.) *Id.* at 610.

¶ 27 *Chiczewski* and *Harrell* clearly involve claims alleging the failure to develop, adopt, operate, or implement an emergency telephone system as required by law, and thus fall within section 15.1 of the Emergency Telephone System Act. However, *Barth*'s broader holding—that the 911 system is not a police protection service—is contrary to our supreme court's subsequent holding in *DeSmet*. Furthermore, *Barth* is only consistent with *DeSmet* to the extent that *DeSmet* recognized that the type of emergency response required affects the applicability of section 4-102 of the Tort Immunity Act. See *DeSmet*, 219 Ill. 2d at 512 (finding section 4-102 is implicated where "the assistance required *** falls within the statutory umbrella of 'police protection services' "). Therefore, *Barth* stands for the proposition that when an emergency 911 caller requests emergency medical services and does not request any police response, section 4-102 is inapplicable because the response does not involve any sort of police protection service. It is not altogether clear to us, however, that under the applicable version of section 15.1 of the Emergency Telephone System Act, a tort claim based solely on a delay in dispatching emergency services implicates section 15.1. Regardless, the 911 call here clearly requested police intervention in response to a robbery in progress and therefore involves a police protection service for the purposes of section 4-102 of the Tort Immunity Act, which is not supplanted by section 15.1 of the Emergency Telephone System Act.

¶ 28 Furthermore, plaintiffs' reliance on *Coleman* is misplaced. The sole issue in *Coleman* was the continued viability of the public duty rule. There, the plaintiff brought wrongful death and survival claims on behalf of the decedent Coretta Coleman. Coretta, who lived in Sugar Creek, an unincorporated area in Will County, placed a 911 call seeking emergency medical services. Her call was routed to a police dispatch center operated by the Will County sheriff's office, which was then transferred to Orland Central Dispatch. *Coleman*, 2016 IL 117952, ¶ 5. The defendant, East Joliet Fire Protection District, provided fire and ambulance services to Sugar Creek and contracted with Orland Central Dispatch to dispatch those services. *Id.* An ambulance was dispatched to Coleman's address but when paramedics arrived, there was no response and the doors were locked. *Id.* ¶ 7. The paramedics spoke to Coleman's neighbors and said that they could not make a forced entry without police present and that the neighbors should call the police to make a forced entry. *Id.* ¶ 8. A supervisor at the East Joliet Fire Protection District ordered the paramedics to leave. *Id.* ¶ 9. Coleman's neighbors called 911 and asked for police to be dispatched, and another neighbor called 911 to report an emergency at "1600 Sugar Creek Drive," which was Coleman's address. *Id.* ¶ 10. The dispatcher contacted Orland Central Dispatch to report a medical emergency, but gave Coleman's address as "1600 Sugar Creek." *Id.* ¶ 11. An ambulance was dispatched to 1600 Sugar Creek Court

instead or 1600 Sugar Creek Drive, and paramedics could not find Coleman's house. *Id.* A different ambulance found Coleman's house 41 minutes after the initial 911 call and were able to enter the home, but found Coleman unresponsive. *Id.* She was taken to a hospital where she was pronounced dead. *Id.*

¶ 29 Coretta's husband, as administrator of her estate, sued numerous defendants for wrongful death and survival. *Id.* ¶ 12. Several of the plaintiff's claims asserted willful and wanton conduct. *Id.* ¶ 13. Defendants moved for summary judgment, asserting that they did not owe Coretta any duty under the public duty doctrine and alternatively asserted various statutory immunities, including the Emergency Medical Services (EMS) Systems Act (210 ILCS 50/3.150 (West 2006)), the Emergency Telephone System Act, and the Tort Immunity Act. *Coleman*, 2016 IL 117952, ¶ 15. The circuit court granted summary judgment in favor of defendants based on the public duty rule, and the appellate court affirmed. *Id.* Our supreme court granted the plaintiff's petition for leave to appeal and abolished the public duty rule, concluding that "the underlying purposes of the public duty rule are better served by application of conventional tort principles and the immunity protection afforded by statutes than by a rule that precludes a finding of a duty on the basis of the defendant's status as a public entity." *Id.* ¶ 61. The supreme court then remanded the case to the circuit court for further proceedings. *Coleman* is plainly inapplicable to the situation here, as the court did not undertake any effort to determine the scope of any statutory immunity. Furthermore, in *Coleman*, the circuit court and appellate court did not reach the issue of whether any statutory immunity applied, instead relying solely on the common law public duty rule. Here, the circuit court did not rely on the public duty rule to reach its decision and instead considered conventional tort principles and the relevant statutory immunities as instructed by *Coleman*.

¶ 30 Finally, even assuming *arguendo* that section 15.1 of the Emergency Telephone System Act did apply, the circuit court properly granted summary judgment in favor of the City because plaintiffs did not come forward with any evidence that might create any genuine issue of material fact as to whether the City's conduct was willful or wanton.

¶ 31 Willful and wanton conduct is defined as "conduct as a course of action which shows actual or deliberate intent to harm or which, if the course of action is not intentional, shows an utter indifference to or conscious disregard for a person's own safety or the safety or property of others." *Pfister v. Shusta*, 167 Ill. 2d 417, 421-22 (1995). Willful and wanton conduct "includes a range of mental states, from actual or deliberate intent to cause harm, to conscious disregard for the safety of others or their property, to utter indifference for the safety or property of others." *Harris v. Thompson*, 2012 IL 112525, ¶ 41. Whether conduct rises to the level of willful and wanton is ordinarily a question of fact (*id.* ¶ 42), but the circuit court may enter judgment in favor of the defendant as a matter of law where the evidence clearly shows that the conduct cannot meet the willful and wanton standard (*Lacey v. Perrin*, 2015 IL App (2d) 141114, ¶ 39).

¶ 32 Here, units were dispatched within eight minutes of the first call, and Hansen stated that OEMC standards require that units be dispatched within 10 minutes of receiving a priority 1A emergency call. Although Hansen could not be certain that there were actually more events pending than units available, she stated that the most likely reason for the eight minute dispatch time was that no units were available for immediate dispatch. Plaintiffs did not come forward with any evidence to show that there were units available for dispatch. Plaintiffs argue that "units 2530, 2534, 2590, 2599, 2573 each appeared to have been available for assignment."

However, at her deposition, Hansen stated that unit 2530 was a "sergeant's car" and would not typically be dispatched to an incident; units 2590 and 2599 were the field unit and watch commander, respectively, and would not typically be dispatched to a robbery; and unit 2534 was on another assignment. Finally Hansen stated that unit 2573 did not appear to have been on another assignment, but there are no other facts in the record to show that unit 2573 was available for dispatch. And while plaintiffs contend that Hansen was not certain that the RAP was the cause of any dispatch delay, plaintiffs do not identify any evidence in the record to show that the dispatcher deliberately ignored the first emergency call or that the dispatcher consciously disregarded the first emergency call. Based on the record before us, we agree with the circuit court that there is no genuine issue of material fact that the City's conduct fell below the standard of willful or wanton. Therefore, even if section 15.1 of the Emergency Telephone System Act applied, the City would be immune from civil liability.

¶ 33 Based on our disposition, we need not address whether the City owed Norton a duty or whether plaintiffs could establish that the City's conduct was a proximate cause of Norton's death.

¶ 34 CONCLUSION

¶ 35 For the foregoing reasons, the judgment of the circuit court is affirmed.

¶ 36 Affirmed.